UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARY MACNAUGHTON, M.D., | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | )<br>)<br>) |
| THE PAUL REVERE INSURANCE COMPANY and UNUM GROUP, | )<br>)<br>)<br>) |
| Defendants. | )<br>) |

CIVIL ACTION
NO. 4:19-40016-TSH

**ORDER AND MEMORANDUM ON PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT (Docket Nos. 103 & 106)**

3/22/2023

**HILLMAN, S.D.J.**

Dr. Mary MacNaughton ("plaintiff") commenced this action against The Paul Revere Insurance Company ("Paul Revere") and Unum Group ("Unum") (collectively, "defendants") to recover unpaid benefits after an adverse benefits determination on her employer-sponsored long-term disability claim. In a previous order, this Court remanded the claim to ensure a "full and fair review" of Dr. MacNaughton's appeal of the adverse decision. After remand, defendants denied Dr. MacNaughton's claim a second time and both parties moved for summary judgment. For the reasons below, under the arbitrary and capricious standard of review, the defendants' decision is supported by substantial evidence and reasoned. Therefore, plaintiff's motion is ***denied*** and defendants' motion is ***granted***.

**Background**

The following is taken from the parties' undisputed statements of material facts, which are based solely on the administrative record. *Liston v. Unum Corp. Officer Severance Plan*, 330 F.3d 19, 23-24 (1st Cir. 2003). The Court cites to the record where a fact is disputed. This summary focuses on facts relevant to the issues at summary judgment and does not repeat all the facts in the earlier summary judgment order. (Docket No. 81).

1. *Claim, Denial, Appeal, Lawsuit*

From 1998 to 2007 the plaintiff worked as a radiologist at Alliance Radiology in Overland Park, Kansas. Her work included reading radiographic images, including X-rays, CT scans, and MRIs. As part of her employment with Alliance, the plaintiff was offered coverage under a Long-Term Disability Plan ("the Plan") insured by the defendants. The Plan provides benefits to individuals who are "totally disabled." The Plan defines "total disability" as being "unable to perform the important duties of [one's] own occupation on a Full-time or part-time basis because of an Injury or Sickness that started while insured under this Policy." The Plan defines a physician's "own occupation" as the physician's "specialty in the practice of medicine." The Plan does not define "important duties."

In 2007, after giving birth to twins, Dr. MacNaughton submitted a disability claim based on difficulties seeing out of her left eye. From 2007 to 2010 she was examined by various doctors and diagnosed with nerve damage in her left eye causing a visual field defect and convergence insufficiency. Paul Revere initially denied the claim on the basis that a visual field defect in one eye would be "filled in" by the healthy eye. However, after objections from her then-attending physician ("AP"), Paul Revere approved her disability claim. Dr. Shatz, Paul Revere's doctor, noted that convergence insufficiency is a "binocular" disorder for which the

right eye cannot correct for the left. Dr. Shatz also noted that the documented nerve damage in the left eye could render the convergence insufficiency condition permanent and non-correctable. Paul Revere paid benefits without issue until 2017. During this time Dr. MacNaughton worked part-time in a supervisory capacity, but never as a diagnostic radiologist.

In June 2017, Paul Revere contacted Dr. MacNaughton and she reported that she had "blurred vision" but that, in her supervisory, non-diagnostic position, "there are not R & Ls really" (restrictions and limitations). Her case was subsequently transferred to Disability Benefits Specialists for further review. (PRL-1840). In August 2017, at least one employee of Paul Revere working on Dr. MacNaughton's case considered whether it was feasible for diagnostic radiologists to work with one eye. (PRL-2004).

In July 2017, Paul Revere received records from Dr. MacNaughton's AP that supported the convergence insufficiency diagnosis. However, that AP retired shortly thereafter and her new AP, Dr. Pole, did not feel comfortable opining on Dr. MacNaughton's capacity to work. In August 2017 he sent Paul Revere an equivocal letter that sheds little light on her condition. (PRL-2033-34). Dr. Pole agreed it would be appropriate for Dr. MacNaughton to be examined by an independent medical examiner ("IME"). (PRL-2025).

Dr. Rosenberg, an IME, examined Dr. MacNaughton and concluded in November 2017 that any deficiencies in visual acuity were correctable, her convergence insufficiency was also correctable, that her vision was otherwise normal, and that she could go back to work. (PRL-2207-14). He did not address or test for nerve damage. Internal documents reveal that Paul Revere never sent Dr. Rosenberg the physical requirements for diagnostic radiologists. (PRL-2226). Paul Revere sent a follow up letter with those requirements to Dr. Rosenberg, (PRL-2255-56), the same day it sent its denial letter to Dr. MacNaughton, (PRL-2246-51). The denial letter

was based substantially on Dr. Rosenberg's report. After receiving the physical requirements for radiologists Dr. Rosenberg did eventually respond that he found Dr. MacNaughton would be "[a]bsolutely able to perform" her duties as a diagnostic radiologist. Dr. MacNaughton appealed that decision.

During the appeal, Dr. MacNaughton submitted a report from her new AP, Dr. Warren. (PRL-2431-53) ("Dr. Warren Report #1"). Because of its importance to the case, the Court recounts that report in some detail. Dr. Warren diagnosed Dr. MacNaughton with "ischemic optic neuropathy" (nerve damage to the left eye). Dr. Warren is adamant in his report that this type of injury is permanent and can neither be corrected nor heal, comparing it to spinal damage or other nervous system injuries. As proof of the nerve damage, he identified a "pupillary abnormality," and conducted an electroretinography (ERG) that demonstrated the left eye did not conduct electricity the same way the right eye did. He insisted in the report that the pupillary abnormality was permanent. He also conducted a visual field test, which showed a visual field deficit adjacent to the optic nerve and argued that the visual field deficit caused Dr. MacNaughton to have reduced reading speeds and created "an area where she cannot see when she reads from left to right." His report concluded that this prevented her from performing her job as a diagnostic radiologist. This report also mentioned that Dr. MacNaughton's visual acuity in her left eye was 20/40, but that does not seem to be the focus of his report. Dr. Warren criticized Dr. Rosenberg's report, arguing that Dr. MacNaughton does not have convergence insufficiency and faults Dr. Rosenberg for not mentioning a pupillary examination or the nerve damage.

Paul Revere submitted all available records, including Dr. Warren Report #1, to Dr. Eisenberg, a different IME. In September 2018, Dr. Eisenberg submitted a report. (PRL-2563-

4

67) ("Dr. Eisenberg Report #1"). Dr. Eisenberg concluded that there was evidence of nerve damage to the left eye, including a visual field abnormality, but that diagnostic radiologists with one healthy eye are not disabled because there is no evidence their job requires depth perception. He noted that convergence insufficiency was not found by Dr. Warren and that it probably predated the injury if it existed at all as it is relatively common. He also found that the presence of normal stereo vision (measured by Dr. Rosenberg and from an earlier report), normal color vision in the left eye, multiple findings of acuity in the 20/20 – 20/25 range, and the absence of optic nerve atrophy or pallor "indicates significant retention of function in [the left] eye." He also argued the eye "recovered a significant amount of function." He concluded that "[i]schemic optic neuropathy is typically a stable condition following an inciting event . . . It is unlikely to progress, and this has been borne out in the past 11 years of serial examinations."

With some equivocation, Dr. Eisenberg did not agree with Dr. Rosenberg's report other than the ultimate conclusion that Dr. MacNaughton was able to work. Contrary to Dr. Warren, the report concludes that (1) one eye is sufficient for diagnostic radiologists (2) the field defect identified by Dr. Warren can be corrected simply by using both eyes and (3) the 20/40 finding is dubious given earlier readings.

On September 20, 2018, Paul Revere denied the claim, adopting Dr. Eisenberg's conclusions. Dr. MacNaughton was never given an opportunity to rebut Dr. Eisenberg's report.

### 2. *Remand and Cross-Motions for Summary Judgment*

Dr. MacNaughton sued and prevailed on summary judgment, receiving a remand from this Court to allow her to rebut Dr. Eisenberg's report. This Court also found that the standard of review for any decision made by the defendants was "arbitrary and capricious." (Docket No. 81).

Based on examinations from 2018 to 2022, Dr. Warren submitted a second report in the form of a deposition. (PRL 3426-76) ("Dr. Warren Report #2"). Dr. Warren argued that Dr. MacNaughton suffered from poor stereo vision and depth perception, and that nerve damage caused those problems, not convergence insufficiency. Furthermore, he tested her "contrast sensitivity," and found that lacking as well. Based on these findings, Dr. Warren concluded that Dr. MacNaughton could not work. Dr. Warren also maintained that there was some loss of acuity, but did not defend his earlier 20/40 finding. He also continued to maintain that there was a visual field deficit, but did not base his finding that Dr. MacNaughton could not work on that deficit. Furthermore, Dr. Warren did not, point-by-point, rebut Dr. Eisenberg's conclusions in his report.

In May of 2022, Dr. Eisenberg issued a final rebuttal to Dr. Warren. (PRL3682-85) ("Dr. Eisenberg Report #2"). After repeating his contention that one eye is sufficient, he addresses Dr. Warren Report #2 point-by-point. First, he argued that "impressive recovery has occurred over time." As evidence, he notes that Dr. MacNaughton's vision is in the 20/20 to 20/25 range according to Dr. Warren's own tests. He also pointed out that in the last few examinations the pupillary defect has not appeared. However, he never directly addresses Dr. Warren's contention that nerve damage does not heal, and accepts that particular finding as proof that the nerve damage has healed—rather than discounting it. Second, he admitted that there is "optic nerve pallor," contrary to his previous report, and there likely is a "visual field defect." However, he concluded that the defect would not affect close-up sight as it only affects the left eye and it would be "filled in" by using both eyes. He also reiterates that if convergence insufficiency exists, it predates the injury. Finally, Dr. Eisenberg dismissed the results of the stereo test as

6

inconsistent with earlier reports and argued that the contrast sensitivity test used by Dr. Warren is not used in clinical settings because it is novel.

In June of 2022 Dr. Warren responded with his final rebuttal. ("Dr. Warren Report #3") (PRL-3724-25). He did not address Dr. Eisenberg's arguments directly, instead arguing that Dr. Eisenberg's opinion was based on "quantitative" measurements like visual acuity and visual fields and that "qualitative" issues with stereo vision and contrast sensitivity are more accurate measures of eyesight. He elaborated:

> [Imagine a driver] who is rendered temporarily blinded by the glare from the lights of an on-coming vehicle. Another example would be attempting to read white letters on a tan background or driving at dawn in a fog. In these circumstances, the individual with "normal" quantitative vision is rendered incapacitated by glare or a reduction in contrast sensitivity.

(PRL-3724). Paul Revere denied the claim relying on Dr. Eisenberg Report #2 as well as an internal review of the job requirements of radiologists. Again, it found that one healthy eye was sufficient for diagnostic radiologists and that the right eye would correct for any deficiencies in the left. It further found that the types of "qualitative" measurements conducted by Dr. Warren are not relevant to the job of a radiologist, arguing that radiologists work under extremely controlled light conditions. Paul Revere has conceded, both in internal documents and in its final denial of benefits, that it is "optimal" for radiologists have two good eyes to read medical images. (PRL-3691; PRL-3740).

## **Legal Standard**

The parties have made cross-motions for summary judgment. In ERISA cases "the burdens and presumptions normally attendant to summary judgment practice do not apply," and instead "summary judgment . . . is simply a vehicle for teeing up the case for decision on the administrative record." *Doe v. Harvard Pilgrim Health Care, Inc.*, 974 F.3d 69, 72 (1st Cir.

2020) (citations omitted). This Court has previously found that the Plan vests Paul Revere with discretion and therefore reviews the denial decision under an "arbitrary and capricious" standard. That requires the decision to be supported by "substantial evidence" and to be "reasoned." *Alexandre v. Nat'l Union Fire Ins. Co.*, 22 F.4th 261, 272 (1st Cir. 2022) (citations omitted). "Evidence is substantial if it is reasonably sufficient to support a conclusion, and the existence of contrary evidence does not, in itself, make the administrator's decision arbitrary." *Id.* (citation omitted). "[A] reasoned determination of the existence of disability vel non requires, inter alia, a review of the material duties of the claimant's particular position and an assessment of how those duties align with the position as it is normally performed in the national economy." *McDonough v. Aetna Life Ins. Co.*, 783 F.3d 374, 380 (1st Cir. 2015). Nonetheless, much of the briefing consists of disputes over the proper standard of review *within* the arbitrary and capricious standard.

### 1. Structural Conflicts of Interest

When a plan gives discretion to an entity to decide claims and that entity is also paying the claims, there is a conflict of interest that does not change the standard of review but is a factor to decide in reviewing a decision. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115-17 (2008). Such a factor might be a "tiebreaker" in a close case. *Id.* at 117. It is undisputed that factor is applicable here, where Paul Revere both pays the claims and decides the claims.

### 2. Procedural Unreasonableness

The First Circuit has held that "procedural unreasonableness" is a factor to consider in reviewing ERISA claims when the plan administrator is afforded discretion. *Lavery v. Restoration Hardware Long Term Disability Benefits Plan*, 937 F.3d 71, 78 (1st Cir. 2019). It might apply if the reasons for denying a claim are internally inconsistent. *Id.* at 79-81; *see also*

*Roehr v. Sun Life Assurance Co. of Canada*, 21 F.4th 519, 525-26 (8th Cir. 2021) (finding it an abuse of discretion to deny benefits based on the same records used to award benefits). The record reveals a number of instances of procedural unreasonableness that justify a less deferential review of Paul Revere's decision.

Paul Revere's decision to reevaluate Dr. MacNaughton's claim was triggered by her offhand statement to an examiner that "there are no R & Ls, really." Prior to this conversation, there is no indication there was a concern with the substance of Dr. MacNaughton's claim. After this exchange, Paul Revere singled out Dr. MacNaughton's case for further review. (PRL-1840). This review occurred despite Paul Revere's knowledge that Dr. MacNaughton was not working as a diagnostic radiologist and did not read medical images. Furthermore, internal documents prior Dr. Rosenberg's examination or Dr. Eisenberg's review reveal that Paul Revere's employees were considering whether it was possible for a diagnostic radiologist to work with only one eye. (PRL-2004). That is inconsistent with the previous definition of disability Paul Revere used in this case when it found that convergence insufficiency—a binocular disorder that affects how the eyes work in concert—rendered a diagnostic radiologist disabled, at least when coupled with nerve damage. Paul Revere's repeated insistence in this litigation that "one eye is good enough" raises questions about their procedural fairness and suggests an attempt to redefine disability and to justify that redefinition on the basis of a single comment taken out of context.

Furthermore, the record reveals that Paul Revere denied Dr. MacNaughton's benefits despite knowing that Dr. Rosenberg—whose report the initial denial relied on—did not receive the physical requirements for a diagnostic radiologist. (PRL-2226). Indeed, at least one Paul Revere employee disagreed with the decision to send out the denial until Dr. Rosenberg had a chance to send a revised report. (PRL-2266-67). "[A] reasoned determination of the existence of

9

disability vel non requires, inter alia, a review of the material duties of the claimant's particular position and an assessment of how those duties align with the position as it is normally performed in the national economy." *McDonough*, 783 F.3d at 380. While Dr. Rosenberg's report ultimately was not the basis for the denial contested in this motion, Paul Revere's behavior suggests that the decision was preordained.

In both reports, Dr. Eisenberg references Dr. MacNaughton's eyesight as "recovering." He does not, however, ever address Dr. Warren's contention that nerve damage is permanent other than admitting that it is usually "stable." Furthermore, one of the pieces of evidence of "healing" in Dr. Eisenberg Report #2 is the change from a 20/40 reading in Dr. Warren's Report #1 to 20/20 to 20/25 readings in Dr. Warren Report #2. Given that Dr. Eisenberg previously dismissed the accuracy of the 20/40 reading in his first report he cannot point to this reading in his subsequent report as evidence of healing. Similarly, he calls into questions many of Dr. Rosenberg's findings but uncritically accepts Dr. Rosenberg's stereopsis test results. This all suggests internal inconsistencies in the decision-making process.

In sum, there are significant reasons to conduct a less deferential review than would be typical under the arbitrary and capricious standard.[1]

### 3. Fresh Eyes Requirement

The plaintiff argues that both the Plan and federal regulations forbid Paul Revere from using the same doctor after remand to justify their decision. The Plan language is nearly identical to the relevant federal regulation, which requires that the health care provider on appeal from an adverse benefit determination "is neither an individual who was consulted in connection with the

---

[1] Plaintiff argues that defendants cannot be trusted in ERISA litigation as a rule, citing a case from 2004 and a recent law review article. *Radford Trust v. First Unum Life Ins. Co. of Am.*, 321 F. Supp. 2d 226, 247-49 (D. Mass. 2004); Philip W. Thomas, *Fifteen Years Later – Did the Unum Group Improve its ERISA Claims Handling Practices?*, 39 Miss. C. L. Rev. 199 (2021). That is too tenuous.

adverse benefit determination that is the subject of the appeal, nor the subordinate of any such individual." 29 C.F.R. § 2560.503-1(h)(3)(iii) & (v). Here, Dr. MacNaughton argues that Paul Revere should have hired a new IME to review her records after this Court remanded her claim.

This Court accepts the general proposition that federal regulations governing appeals in ERISA cases apply to remands. However, it does not follow that *this* regulation applies in the way plaintiff argues. The language Dr. MacNaughton cites governs the relationship between adverse determinations and appeals—it is why Dr. Rosenberg did not re-examine the plaintiff after she appealed her denial of benefits, and Paul Revere instead engaged Dr. Eisenberg. Therefore, the question is whether the remand created a new appeal, and triggers the requirement for the defendants to hire a new doctor, or merely "continued" the existing appeal. If the remand was given on the grounds that Dr. Eisenberg's review was itself procedurally unfair, there might be grounds to adopt plaintiff's position. *Cf. Spears v. Liberty Life Assurance Co. of Boston*, No. 3:11-cv-1807-VLB, 2019 WL 4766253, at *49-*50 (D. Conn. Sept. 30, 2019). But the purpose of the remand *here* was to allow Dr. MacNaughton an opportunity to rebut Dr. Eisenberg's report, which she did. (Dr. Warren Report # 2). Therefore, in this case the remand was merely to continue the appeal under more fair conditions and there was no requirement that defendants engage with a new doctor.

        4. *Attending and Non-Examining Physicians*

Paul Revere is generally under no obligation to treat an AP's opinion differently than a non-AP's opinion. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). Plaintiff argues that Paul Revere signed a settlement agreement that it would only disregard AP's opinions with "specific reasons why the opinion is not well supported by medically acceptable clinical or diagnostic standards and is inconsistent with other substantial evidence in the record."

*Dwyer v. Unum Life Ins. Co. of Am.*, 548 F. Supp. 3d 468, 473 (E.D. Pa. 2021). As such, she argues that Paul Revere erred in insufficiently explaining why it based its decision on Dr. Eisenberg's reports rather than Dr. Warren's. The settlement was not included in the administrative record, and it is not clear the Court can take judicial notice of it. Furthermore, it appears that the settlement only applies to policies sold after 2004, which would not include this policy. *Alvarez v. Unum Life Ins. Co. of Am.*, No. 07-00974-WHA, 2007 WL 2348737, at *4 (N.D. Cal. Aug. 14, 2007). Regardless, Dr. Eisenberg addresses Dr. Warren's contentions nearly point-by-point, explaining why Dr. Warren's conclusions or methods are not consistent with "medically acceptable clinical or diagnostic standards." Whether or not the settlement applies, Paul Revere has met its obligations.

Similarly, Dr. MacNaughton repeatedly references the fact that Dr. Eisenberg's reports are based on reviews of records rather than direct examinations. "[A] nonexamining physician's review of a claimant's file [is treated as] reliable medical evidence," at least under the arbitrary and capricious standard. *Ovist v. Unum Life Ins. Co. of Am.*, 14 F.4th 106, 121-22 (1st Cir. 2021) (citation omitted).

## Analysis

### 1. *Paul Revere's Motion for Summary Judgment*

The most recent denial of Dr. MacNaughton's benefits relied on two grounds in Dr. Eisenberg Report #2; that the inability to use one eye does not render a diagnostic radiologist disabled and that Dr. MacNaughton has sufficient use of both of her eyes. Because there is substantial evidence supporting the second ground this Court need not address the first.

In relevant part, the report supporting the denial concludes that (1) Dr. MacNaughton likely has nerve damage causing a visual field defect in her left eye, (2) she can correct for that

defect by using her right eye concurrently with her left, (3) she does not have convergence insufficiency, and (4) while she may suffer from some of the "qualitative" conditions discussed by Dr. Warren, but his diagnoses are the product of non-standard testing, inconsistent with prior results, and/or not relevant to the position of a diagnostic radiologist.[2] The parties do not dispute (1) and (3).

As to (2), Dr. MacNaughton argues that Paul Revere has shifted the definition of "disabled," finding her non-disabled despite having an identical condition to the one she had when her claim was initially approved. The initial decision to grant Dr. MacNaughton benefits was based on the *combination* of nerve damage in her left eye and a diagnosis of convergence insufficiency. Now, while both Dr. Warren and Dr. Eisenberg agree that Dr. MacNaughton suffers from nerve damage in her left eye as well as a visual field defect, they also agree that the convergence insufficiency diagnosis was likely a mistake. Therefore, Paul Revere is acting consistently with its 2010 decision in determining that there is no disability. Furthermore, there is substantial evidence in the record from multiple doctors that a healthy eye can correct for the visual field defect in the other eye. Indeed, Dr. Warren never explicitly argues otherwise.

Normally, a Court would have to determine whether the decision was "reasoned"; that is, whether the defendant applied the medical data to the requirements of the claimant's job. But the parties agree that the only barrier to Dr. MacNaughton working is the damage to her left eye. If that damage is not an issue, there is no disability.

Rather than contest this finding directly, Dr. Warren's second report focuses on "qualitative" measures of eyesight—ground (4) above. As Paul Revere points out, this argument appears for the first time in Dr. Warren's second report. Dr. Eisenberg's second report addresses

---

[2] For the reasons above, the Court does not consider Dr. Eisenberg's comments about Dr. MacNaughton's nerve damage "healing." Nonetheless, it is not necessary to the findings above.

these new findings point-by-point. He casts doubt on the "contrast sensitivity" test, arguing that it is not appropriate for clinical use. He also points out that the stereopsis finding is inconsistent with earlier findings. Although this Court is skeptical of his reliance on Dr. Rosenberg's report, considering Dr. Eisenberg otherwise dismissed Dr. Rosenberg's findings, there are other records supporting the finding of normal stereo vision. Not only do these records provide a basis for Dr. Eisenberg's conclusion, it also explains why he would credit this aspect of Dr. Rosenberg's report.

Rather than rebut these points, Dr. Warren's final report doubles down on the use of "qualitative" measurements. Because Dr. Warren never rebuts Dr. Eisenberg's findings directly, and because Dr. Warren's first report relied on "quantitative" findings that he now argues are less relevant, Paul Revere has a substantial basis to credit Dr. Eisenberg over Dr. Warren. Furthermore, Paul Revere's denial notes that the examples that Dr. Warren gives in his third report—such as driving in fog—have little to do with the highly-controlled light conditions that diagnostic radiologists work under. This Court agrees and finds that the decision was "reasoned" under the arbitrary and capricious standard.

Finally, Dr. MacNaughton argues that because vision is subjective, it should be analyzed similarly to pain. While the First Circuit has held that requiring an objective basis of the diagnosis of a subjective disease might be arbitrary, requiring an objective basis to determine whether the person is disabled is not. *Ovist*, 14 F.4th at 123. Here, Paul Revere must accept that Dr. MacNaughton has some subjective difficulties in her left eye. Paul Revere does not need to accept that Dr. MacNaughton is disabled absent objective tests proving otherwise. As discussed above, Dr. Warren never adequately explains how his diagnosis affects the controlled conditions radiologists work in.

To be clear, this Court need not decide which doctor is correct. Because Dr. Eisenberg engages Dr. Warren's reports point-by-point, and Dr. Warren does not engage with Dr. Eisenberg's reports in a similar manner, even under a less deferential review than the arbitrary and capricious standard, Paul Revere is free to credit Dr. Eisenberg's opinion over Dr. Warren's. "[I]n the presence of conflicting evidence, it is entirely appropriate for a reviewing court to uphold the decision of the entity entitled to exercise its discretion." *Gannon v. Metro. Life Ins. Co.*, 360 F.3d 211, 216 (1st Cir. 2004). While this Court has concerns with the defendants' conduct in this case, in particular their attempt to redefine a disability before any changes in the medical record were revealed, plaintiff's undisputed misdiagnosis ultimately obviates those concerns. For these reasons, Paul Revere's motion is *granted*.

*2. Dr. MacNaughton's Motion for Summary Judgment*

Because Paul Revere's motion for summary judgment is granted, Dr. MacNaughton's is necessarily *denied*.

## Conclusion

For the reasons above, Dr. MacNaughton's motion for summary judgment is ***denied*** and Paul Revere's motion for summary judgment is ***granted***.

**SO ORDERED**

                                            ***/s/ Timothy S. Hillman***
                                            **TIMOTHY S. HILLMAN**
                                            **SENIOR DISTRICT JUDGE**